## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1809 | **DATE** | 11/17/2004 |
| **CASE TITLE** | Central States Pension Fund vs. Kabbes Trucking, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Bench Trial Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Clerk shall enter judgment for Plaintiffs in the amount of $54,305.86, pursuant to Rule 58. See Opinion and Order of November 17, 2004. Plaintiffs shall file a proposed order indicating interest owed by Defendants since February 16, 2001, liquidated damages owed by Defendant, and attorneys fees and costs owed by Defendant. Plaintiffs shall file this proposed order on or before December 6, 2004. Defendants may file a response to this proposed order on or before December 20, 2004. Plaintiffs may file a reply to Defendant's response on or before January 3, 2005.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | NOV 18 2004 | |
| X | Docketing to mail notices. | date docketed | |
| X | Mail AO 450 form. | rbf | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| | | U.S. DISTRICT COURT | |
| | courtroom deputy's initials | 2004 NOV 17 PM 5:02 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND,
and HOWARD McDOUGALL, Trustee,

        Plaintiffs,

        v.

KABBES TRUCKING COMPANY, an
Illinois Partnership, and
EFFINGHAM ASPHALT COMPANY d/b/a
KABBES TRUCKING COMPANY,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 02 C 1809

Honorable Charles R. Norgle

DOCKETED

NOV 1 8 2004

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

## I. INTRODUCTION

Plaintiff Central States, Southeast and Southwest Pension Fund ("Fund") is an employee

benefit plan and trust. The Fund and its Trustee bring this action pursuant to the Employee

Retirement Income Security Act of 1974 ("ERISA"), alleging that Defendants owe contributions

to the Fund for the period from October 1990 to January 2002. Counsel submitted, and the court

reviewed, pretrial proposed findings of fact and conclusions of law. The court then conducted a

bench trial on June 18, 2003. The court heard evidence from both parties, and entered an Order

asking the parties to submit post trial findings of fact and conclusions of law. Based on the

totality of the evidence, the court adopts the findings of fact and conclusions of law proffered by

the Plaintiffs, which are recited as follows.



## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.    Facts Relating To Parties And Relationships.**

1.    The Pension Fund is an employee benefit plan and trust funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters ("IBT") on behalf of employees of those same employers.  All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing pension benefits to participants and beneficiaries of the Pension Fund and paying the administrative expenses of the Pension Fund (Trial Transcript at pp. 11-12 and Art. I, Sec. 1, Art. II, Sec. 1, Art. III, Sec. 1 and Art. IV, Sec. 16 of Plaintiffs' Ex. 4).[1]

2.    Operation of the Pension Fund is governed by the Pension Fund Trust Agreement ("Trust Agreement") (R 8;  PX 4).  The Pension Fund is managed by a Board of Trustees consisting of an equal number of employer and union selected representatives (Art. II, Sec. 2 of PX 4).

3.    The Trustees of the Pension Fund have adopted a defined benefit plan (R 262;  §§ 4.01 to 4.09 of PX 5).  The Pension Plan establishes approximately 40 schedules of benefits, called benefit classes, which differ in amount of retirement benefits provided, amount of associated contribution rate and on the availability of certain deferral privileges (R 262; § 3.01(d)(1) and (2) of PX 5).  For each benefit class, the Trustees have published specified contribution rates which are negotiated by the local unions and employers (such as the Defendants and Local 26) (R 262;  § 3.01(c) and (d)(1) and (2) of PX 5).  The

---

[1]    Subsequent references to the pages of the trial transcript will be designated as "(R ___)."  Subsequent references to the Plaintiffs' trail exhibits will be designed as "(PX ___)."  Subsequent references to the Defendants' trial exhibits will be designated as "(DX ___)."

contribution rates associated with each benefit class do not change over time (R 265; § 3.01(c) of PX 5). To acquire higher benefits from the Pension Fund, the collective bargaining parties must negotiate a higher contribution rate that is associated with a higher benefit class (R 265; § 3.01(c) of PX 5).

4. Local Union 26 ("Local 26") of the IBT is a labor organization which, at all relevant times, represented, for the purposes of collective bargaining, certain employees of Kabbes and Effingham (R 34, 120).

5. Kabbes is an Illinois partnership (R 114). All of the partners in the Kabbes Trucking partnership are members of the Kabbes family (R 114).

6. Effingham is an Illinois corporation (R 115). The current shareholders of Effingham are the Richard J. Kabbes Family Limited Partnership, the John R. Kabbes Family Limited Partnership and the Hoene Family Limited Partnership (R 114-115). The partners of the Hoene Family Limited Partnership are Robert J. Hoene and Mary K. Hoene (R 115). The partners of the Richard J. Kabbes Family Limited Partnership are Richard J. Kabbes and Carolyn Kabbes (R 115). The partners of the John R. Kabbes Family Limited Partnership are John R. Kabbes, Jane C. Kabbes, Douglas J. Kabbes, Gregg A. Kabbes, Brad W. Kabbes, and Todd A. Kabbes (R 115).

7. The officers of Effingham are John Kabbes, Richard Kabbes, Mary Hoene and Robert Hoene (R 115-116).

8. Mary Hoene is the sister of John and Richard Kabbes (R 115).

**B. Facts Relating To The Labor Agreements.**

9. Kabbes signed a collective bargaining agreement with Local 26 covering the period from July 1, 1980 to June 30, 1983 (the "1980 Agreement") (PX 1).

10.     Article I, Section 2 of the 1980 Agreement indicates that covered employees are "truck

drivers and all yard help." (PX 1).

11.     Article XVIII of the 1980-1983 Agreement requires Kabbes and Effingham to pay to the

Pension Fund contributions on behalf of each covered employee who works two (2) days

or parts of two (2) days during the week (PX 1).

12.     Under Article XVII of the 1980 Agreement, Kabbes also agreed to pay contributions to

the Illinois Conference of Teamsters Welfare Fund on behalf of covered employees

(PX 1).

13.     Article XIX of the 1980 Agreement provides as follows with respect to the duration of the

1980 Agreement:

**ARTICLE NO. XIX – TERMINATION OF AGREEMENT**

This Agreement shall be in full force and effect from July 1, 1980 to and
including June 30, 1983 and shall continue in full force and effect from year to
year thereafter unless written notice of desire to cancel or terminate the
Agreement is served by either party upon the other at least sixty (60) days prior to
annual date of expiration.

It is further provided that where no such cancellation or termination notice is
served and the parties desire to continue said Agreement but also desire to
negotiate changes or revision in this Agreement, either party may serve upon the
other a notice, at least sixty (60) days prior to June 30th, of any contract year,
advising that such party desires to continue this Agreement but also desires to
revise or change terms or conditions of such Agreement.

(PX 1). A clause in a labor agreement such as Article XIX of the 1980 Agreement that indicates

that the contract will continue in effect from year to year after a specified earliest possible

expiration date absent a written notice of termination is known as an "Evergreen Clause."

(R 206).

14.     John Kabbes, on behalf of Kabbes, signed an agreement extending the 1980 Agreement

(the "1983 Extension Agreement"). The 1983 Extension Agreement contains an

Evergreen Clause which indicated that it would remain "in full force and effect from July 1, 1980 through April 30, 1989 and each year thereafter unless written notice of termination or desired modification is given at least sixty (60) days but no more than ninety (90) days prior to the expiration date by either of the parties hereto." (the "1983 Extension Agreement") (PX 2).

15. John Kabbes, on behalf of Kabbes, signed an agreement extending the 1980 Agreement from May 1, 1989 to April 30, 1992 (the "1989 Extension Agreement") (PX3). The 1989 Extension Agreement did not contain an Evergreen Clause. Instead, it provided as follows with respect to duration:

### TERMINATION OF THIS MODIFIED EXTENSION

This Agreement shall be effective May 1, 1989 and remain in effect and full force through April 30, 1992. It is agreed that throughout the month of April 1992 this Agreement shall be open for changes and modifications if negotiations are on going but not settled by April 30, 1992, a thirty day extension shall be in effect if agreed to in writing by both parties.

(PX 3).

16. The 1983 Extension Agreement and the 1989 Extension Agreement are undated. The evidence establishes that these documents were signed contemporaneously in early 1992. This is established by the following:

a. In a telephone conversation on September 3, 1987, Local 26 advised the Pension Fund that the parties had agreed to extend the 1980 Agreement (DX GG). In a telephone conversation on September 10, 1987, Local 26 indicated that it was still trying to get a renewal agreement (DX GG). These conversations establish that the 1983 Extension was not signed as of September 1987.

b. In a telephone conversation on or about September 8, 1988, Local 26 advised the

Pension Fund that it was still trying to get a contract renewal and Kabbes was working under expired contract (DX B). This establishes that as of September 6, 1988, neither the 1983 Extension or the 1989 Extension were signed.

c.    As of August 12, 1991, the Pension Fund's computer record indicated that Kabbes' contract expired on June 30, 1983 (p. 2 of DX D). If the Pension Fund had the 1983 Extension Agreement and/or the 1989 Extension Agreement as of that date, the computer record would have reflected an expiration date of April 3, 1989 or April 30, 1992 (R 212-13).

d.    A log of a telephone conversation between the Pension Fund and Local 26 dated August 23, 1991 indicates that the Pension Fund was calling because it "need[ed] CBAs since 1983" (p. 3 of DX D). The log indicates that Local 26 advised the Pension Fund that neither Kabbes nor Effingham had signed a contract since 1983 and the employees would not go on strike so as far as Local 26 was concerned, the Pension Fund "should and can terminate them." (p. 3 of DX D). Based upon this conversation, the Pension Fund employee suggested to her supervisor that it may be advisable to ask the Trustees to consider terminating Kabbes and Effingham's participation (p. 1 of DX D). This establishes that as of August 23, 1991, the 1983 Extension Agreement and the 1989 Extension Agreement had not been signed.

e.    One of the Pension Fund's managers (Thomas Baxa) testified that the Pension Fund initially received both the 1983 Extension Agreement and the 1989 Extension Agreement on April 30, 1992 (R 222-26). This testimony is supported by the "April 30, 1992 [Date] Received" stamped on both the 1983 Extension

Agreement and the 1992 Extension Agreement by the Pension Fund's Pension Department (PX 42b and 42c). The Contract Update Checklist that the Pension Fund's Contracts Department prepares upon receipt of a contract was not completed until May 1992 and indicates that the Contracts Department received the 1982 Extension Agreement and the 1989 Extension Agreement on May 8, 1992 (DX I and R 222-24).

f.  The 1989 Extension Agreement increased the pension contribution rate to be paid by Kabbes effective May 1, 1989 (PX 42(c)). After processing the 1989 Extension Agreement, the Pension Fund retroactively billed Kabbes and Effingham $5,000 in May 1992 to account for the increased pension rate in April 1992 (R 227-229). Kabbes and Effingham paid the retroactive billing in June 1992 (R 227, 228).

17. Effingham was also a signatory to a collective bargaining agreement with Local 26 that required it to contribute to the Pension Fund on behalf of its truck drivers (R 121, 155; p.3 of DX D).

18. The parties have stipulated neither the Pension Fund nor Effingham can locate copies of the agreements signed by Effingham (R 148).

19. Effingham signed the same 1983 Extension Agreement and the 1989 Extension Agreement that were signed by Kabbes (R 122-23). This is established by Effingham's conduct since 1992. The employees of both Kabbes and Effingham are reported to the Pension Fund on the same reporting forms that identify Kabbes as the employer (R 129-30; PX 7-18, 35-38). Several Effingham employees were reported to the Pension Fund on these reports for the period covered by the rebill that resulted from the higher

contribution rates set forth in the 1989 Extension Agreement (R 129-30; PX 7-9, 37) so these employees were necessarily included in the rebill. The fact that Effingham paid the rebill on its employees at the same time as Kabbes and contributed to the Pension Fund after April 1992 at the higher rate required by the 1989 Contract Extension, establishes that Effingham signed the 1983 Extension Agreement and the 1989 Extension Agreement.

20.    By letter dated April 15, 1986, Local Union 26 advised Kabbes that it "desire[d] to negotiate certain changes and modifications in our now existing collective bargaining ... [that] expires on June 30, 1986." [DX HH).

21.    However, no collective bargaining agreement between Local Union 26 and Kabbes had an expiration date of June 30, 1986 (PX 1& 2).

22.    The April 15, 1986 letter indicated that Local 26 wanted to negotiate "changes or modifications", it did not indicate that Local 26 desired to cancel or terminate any agreement (DX HH). No evidence was presented that a written notice to terminate or cancel the 1980 Agreement was provided at trial.

23.    As indicated above, the 1983 Extension Agreement was not signed until 1992 (¶ 16, infra), therefore, the April 15, 1986 letter could not have terminated the 1983 Extension Agreement.

24.    No evidence of a written notice of a desire to terminate or modify the 1983 Extension was been presented at trial.

25.    No evidence that Effingham provided a written notice of its desire to cancel or terminate its 1980 Agreement or the 1983 Extension Agreement has been presented.

26.    After April 30, 1992, there were no collective bargaining negotiations between Local 26

and Effingham or Kabbes (R 151).

27. The audit that triggered this case was initiated by a request from Pat Gleason of Local 26 in 2000 (R 61; DX J & K). Gleason advised the Pension Fund that Kabbes and Effingham had at least 5 unreported eligible employees (DX J & K). Gleason advised the Pension Fund that the labor agreement "expired in 1992," however, he advised the Pension Fund that Local 26 believed that the contract had continued in effect under the Evergreen Clause (DX M). Gleason also advised the Pension Fund that he believed contributions were owed to the Pension Fund on all employees regardless of union membership (DX M). Gleason must have believed that the Defendants were still contractually obligated to contribute to the Pension Fund or there would have been no reason for him to request an audit.

28. On July 28, 2000, Bill Bounds of Local 26 also advised the Pension Fund's auditors that the Defendants' employees had refused to strike so the Defendants no longer had a contract with Local 26. As a result, he had issued union "withdrawal cards" to the 6 union employees "covered by the contract" (DX V). However, Bounds did not indicate when this alleged action occurred.

**C. Facts Relating To Contribution Payments.**

29. The Pension Fund relies upon participating employers to self-report the work history of their eligible employees. Based upon the reports submitted by the employers, the Pension Fund sends a monthly contribution bill. The Pension Fund has created reporting forms for participating employers to use to report changes in the covered workforce (e.g., layoffs, new hires, sick leaves, etc.) which are known as "Billing Change and Corrections Forms" or "Employee Billing Change and Corrections Forms" (hereinafter collectively

referred to as "EBCC Forms"). Sometime after 1999, another reporting form known as a Turnaround Document ("TAD Form") was used. It is only necessary for an employer to submit an EBCC Form or a TAD Form for a month where there has been a change in the covered workforce; if an EBCC Form or a TAD Form has not been submitted, the Pension Fund assumes that there has been no change in the covered workforce and bills the same amount for each week that was billed for each week of the prior month (R 10-20).

30. Kabbes and Effingham submitted EBCC Forms to the Pension Fund prior to April 30, 1992, which as noted above (see ¶ 19, infra.), identified only Kabbes as the employer (R 129-30; PX 7-9, 35-38). Although Kabbes and Effingham now claim that their contractual obligation to contribute to the Pension Fund ended on April 30, 1992, they submitted EBCC Forms and TAD Forms reporting the work history of certain eligible employees for the period of May 1992 through April 2003 (R 133; PX 9-19, 35-38).

31. Kabbes and Effingham completed EBCC Forms by entering the names of their employees, the employees' social security numbers, and the employees' current status (e.g., laid off, on sick leave, rehired, etc.). On the TAD Forms, the employees on whose behalf the Pension Fund was billing were listed and Kabbes and Effingham noted any changes or additions on the TAD Form (R 10-20, 133; PX 7-19).

32. The EBCC Forms, the TAD Forms as well as the monthly bills submitted to employers by the Pension Fund contain a Certification Clause which states:

The employer hereby reaffirms his obligation to make contributions required by the Collective Bargaining Agreement and further represents that all employees eligible to participate in the Fund, in accordance with the rules of the Fund and the 'Employee Retirement Income Security Act of 1974' are being reported and only those eligible employees are being reported."

(R 10-20; PX 7-19).

33. The EBCC Forms submitted by Kabbes and Effingham from 1990 through March 2003 were regularly, but not always, signed by John or Richard Kabbes directly below the Certification Clause (PX 7-15). The TAD Forms submitted after 1999 were signed by Jane Sudkamp or Richard Goldstein (PX 16-17; R 134-136). Goldstein was delegated the responsibility for preparing the EBCC Forms and the TAD Forms that were submitted to the Pension Fund until his death in 2001 (R 119, 146-7). After Goldstein's death, Jane Sudkamp was delegated the responsibility for submitting the TAD Forms to the Pension Fund (R 118).

34. The purpose of requiring employers to reaffirm their obligation to contribute under the Certification Clause is to insure that the employer is contractually obligated to continue making contributions to the Pension Fund (R 17, 19, 221, 252).

35. After April 30, 1992, Kabbes and Effingham did not alter either the manner in which they had previously submitted EBCC Forms (and TAD Forms after 1999) or the manner in which they remitted contributions (R 136).

36. After April 30, 1992, Rich Goldstein was delegated the duty to communicate with the Pension Fund on behalf of Kabbes and Effingham (R 118-119).

37. Kabbes and Effingham continue, to the present day, to report work history and pay contributions to the Pension Fund for some of their truck drivers (R 80, 129, 130; PX 18-19).

38. During the period after April 1992 until some time in 2000, Kabbes and Effingham also remitted contributions to the Illinois Conference of Teamsters Welfare Fund on behalf of the same employees who were listed on the reporting forms that were submitted to the

Pension Fund (R 127).

39. The Pension Fund provides pension credit to employees based upon the work history reported by participating employers. The Pension Fund has awarded credit to the employees of Kabbes and Effingham based upon the work history reported for the period of April 1992 through the present (R 262, 266; PX 37, 38; pp. 430-37 of DX F).

40. The benefit entitlement of David Althoff and David Carroll will be significantly reduced if the credit they earned after April 1992 based upon the work history reported by Effingham on their behalf is eliminated. Neither of these individuals have retired. The impact on their benefit would be as follows:

| NAME | AGE | BENEFIT AS OF 5/31/03, INCLUDING POST 4/30/92 CREDIT | BENEFIT AS OF 5/31/03 EXCLUDING POST 4/30/92 CREDIT |
|------|-----|------|------|
| D. Althoff | 50 | 19.20 years $312.14 at age 65 | 8.775 years $98.54 at age 65 |
| D. Carroll | 58 | 24.525 years $400.00 at age 60 | 14.125 years $148.90 at age 65 |

(R 267, 269; PX 37).

41. The benefit entitlement of Kenneth Hollscher and Leroy Wente will be significantly reduced if they lose the credit they earned after April 1992 based upon the work history reported by Kabbes on their behalf. Neither of these individuals have retired. The impact on their benefit would be as follows:

| NAME | AGE | BENEFIT AS OF 5/31/03, INCLUDING POST 4/30/92 CREDIT | BENEFIT AS OF 5/31/03 EXCLUDING POST 4/30/92 CREDIT |
|------|-----|------|------|
| K. Hoelscher | 63 | 33.050 years $434.59 at current age | 14.400 years $167.46 at age 65 |

| L. Wente | 69 | 29.111 years | 18.661 years |
| | | $400 at current age | $149 at current age |

(R 269; PX 38).

42.     William Pals was an employee of Kabbes from 1968 to 1999 (pp. 430-38 of DX F).

43.     Pals applied for retirement benefits in March, 1999 (pp 438-42 of DX F).

44.     At that time, he represented that he was a member of Teamsters Local 26 (p. 438 of DX F).

45.     William Pals retired on May 12, 1999 and began receiving a monthly pension benefit for life of $421.07 (R 269; PX 38).

46.     Without credit earned based upon his employment by Kabbes from April 1992 to May 12, 1999, Pals' monthly benefit would be $400.00 and he would owe the Pension Fund the difference between the $421.07 he has received since May 1999 and the $400 he would be entitled to receive (50 months x $21.07 = $1,053.50) (R 269; PX 38). This prospective benefit reduction and liability for the overpayment would probably impose a significant hardship on a 69 year old individual who is receiving a relatively small monthly pension.

**D.     Facts Relating To the Pension Fund's Audit.**

47.     The Trust Agreement permits the Pension Fund to audit the records of participating employers (R 8; Art. III, § 5 of PX 4; DX KK).

48.     Central States' Special Bulletin 85-6 issued to participating employers and local unions on August 1, 1985 (which would include Kabbes and Effingham), informed participating employers and unions that audits conducted by the Pension Fund would conform to Article III, Section 5 of the trust agreements, as interpreted by the Supreme Court (DX KK).

49.  Special Bulletin 85-6 does not require non-participating employers to permit an audit of their records (DX KK).

50.  On or about May 23, 2000, the Pension Fund sent a letter to Kabbes which notified Kabbes that the Pension Fund intended to perform an audit of its records to verify that all required contributions had been paid for the period from December 29, 1996 to December 25, 1999 (R 34, 35; PX 20).

51.  The May 23, 2000 letter notified Kabbes that the Pension Fund was entitled to the audit pursuant to the Pension Fund Trust Agreement, Article III, Section 5 and that the purpose of the audit review was to identify all eligible plan participants and verify that contributions were properly reported for all eligible plan participants (R 36; PX 20).

52.  To conduct the audit, payroll ledgers, individual earning cards, IRS forms, seniority lists, personnel files, time cards and daily driver logs are reviewed (R 36).

53.  Rich Goldstein was delegated the authority to represent Kabbes and Effingham in relation to the audit, including making statements to the auditors (R 38, 138; PX 21).

54.  This delegation was made with the knowledge that Mr. Goldstein was in poor health (R 154-155).

55.  The audit was postponed twice at the request of Kabbes due to Goldstein's health which prohibited him from participating in the audit (R 44).

56.  The audit was conducted on December 5 and 6, 2000, and included a review of both Kabbes' and Effingham's payroll records (R 45, 46; PX 24).

57.  At no time did Kabbes or Effingham object to the audit or question the Pension Fund's right to review the records of either Kabbes or Effingham (R 45, 46; PX 21).

58.  Goldstein told the auditors that both Kabbes and Effingham employed truck drivers who

were not being reported to the Pension Fund because they were not union members (R 48; PX 22, 25, 26).

59. Goldstein advised the Pension Fund's auditors that he believed that union membership was a requirement for eligibility to participate in the Pension Fund (R 42, 43; PX 22, 25, 26).

60. Goldstein advised the Pension Fund's auditors that contributions would have been made on behalf of the non-union employees if he had known that union membership was not a requirement (R 47; PX 25, 26).

61. John Kabbes and Goldstein were present at the "audit closing meeting" which occurred after the auditors had reviewed the payroll records of Kabbes and Effingham. At the meeting, the auditors advised John Kabbes and Goldstein that contributions were owed on behalf of the unreported Kabbes and Effingham employees (R 51).

62. The Pension Fund's auditors testified, and Jack Kabbes confirmed, that at no time were the Pension Fund's auditors advised that either Kabbes or Effingham believed that they did not owe anything on the unreported employees because they had no contractual obligation to contribute to the Pension Fund or because either Kabbes or Effingham believed that their contract had expired (R 48, 53-54, 101-02, 136-37; PX 22, 25 and 26). In fact, Jack Kabbes advised the auditors that he would be willing to prospectively contribute on the non-union employees (PX 27). The first time either Kabbes or Effingham asserted that there was no contractual obligation to contribute to the Pension Fund was after this case was filed. Despite asserting that there is no existing contractual relationship, Kabbes and Effingham, as noted above (¶¶ 30, 37, infra.), continued to remit contributions to the Pension Fund through the date of the trial (R 80, 129, 130; PX 18-

19).

63. The Pension Fund's audit was eventually expanded back to 1990 and forward through June 14, 2003 (R 55-6, 171, 179; PX 29, 43).

64. The audit revealed that for all or part of the period of October 1990 through June 14, 2003, Kabbes employed Jed Goeckner, David Hess, Norbert Hille, Douglas Kinkelaar and Lee Meinhart as truck drivers (R 51-53, 98, 179; PX 29, 43). Payroll records were not available for the period prior to May 1994 so findings were estimated for the two employees who were employed before May 1994 (Hille and Kinkelaar) (R 56-7). Kabbes has never challenged the accuracy of the estimated audit amounts (R 57-58).

65. Kabbes did not report Goeckner, Hess, Hille, Kinkelaar and Meinhart as employees on EBCC Forms or TAD Forms and did not pay any contributions on their behalf because Kabbes believed that they were not union members and assumed that eligibility for benefits turned on union membership (R 55-57, 179; PX 7-19, 29, 43).

66. Kabbes failed to report the following weeks of work for the following truck drivers for the period of October 21, 1990 through June 14, 2003:

       Jed Goeckner  89 weeks

       David Hess       131 weeks

       Norbert Hille     353 weeks

       Douglas Kinkelaar   486 weeks

       Lee Meinhart  169 weeks

(R 55-57, 98, 99, 179; PX 29, 43).

67. During all or part of the period of June 1994 through June 14, 2003, Effingham employed Tom Dasenbrock and William Wernsing as truck drivers (R 55-57, 98, 99, 179; PX 29,

43).

68. Effingham did not report Dasenbrock and Wernsing as employees on EBCC Forms or TAD Forms and did not pay any contributions on their behalf because Effingham did not believe that they were union members (R 55-57, 98, 99, 179; PX 29, 43).

69. Effingham failed to report the following weeks of work for the following truck drivers for the period of June 1994 through June 14, 2003:

   Tom Dasenbrock        155 weeks

   William Wernsing      295 weeks

70. In addition, the audit revealed minor reporting errors with respect to Effingham truck drivers David Carroll, Donald Miller and Michael Thoele had been misreported and as a result, one week of additional contributions was owed on each of these individuals (R 55-57; PX 29).

71. Contributions were due to the Pension Fund from Kabbes and Effingham at a rate of $21.00 per week for the period of October 21, 1990 through April 27, 1991 and $24.00 per week for the period of April 28, 1991 through June 14, 2003 (R 55-57, 179; PX 1, 2, 3, 29, 43). At these rates the contributions owed to the Pension Fund by Kabbes and Effingham total as follows:

   Effingham     $12,936

   Kabbes        $27,297

72. Interest on the amounts owed by Kabbes and Effingham for 1990 through 1999 was $10,548.86 through February 15, 2001 (PX 29).

73. John Kabbes was informed of the audit findings for 1990 to 1999 by letter dated January 23, 2001 (R 54-55; PX 29).

74. Despite his medical condition, Goldstein continued to actively work for Kabbes and Effingham until at least mid-April 2001 (PX 17(c)).

75. Kabbes and Effingham wanted to pay contributions on behalf of all of their non-reported truck drivers, but did not do so because they believed they were ineligible since they were not union members (R 130, 141-42; PX 27).

76. The audit fees and costs incurred by the Pension Fund total $3,524.00 (R 177-179; PX 39).

77. Prior to the initiation of this lawsuit, neither Kabbes nor Effingham ever informed the Pension Fund that they believed that the 1980 Agreement or Extension Agreements had expired and had no force or effect (R 48, 53-4, 101-02, 136-137, 139, 164-5, 203; PX 7-19).

78. At no time prior to the audit in 2000 was the Pension Fund aware that Kabbes and Effingham had not reported all of their eligible employees to the Pension Fund (R 99).

79. No employee of the Pension Fund ever told the Defendants that they did not need a collective bargaining agreement in order to contribute to the Pension Fund or that contributions only had to be made on behalf of union members (R 131, 138).

80. The Pension Fund has never received a written notification of an intent to terminate from the Fund, Kabbes and Effingham continued to report employees and otherwise acted as though they are currently obligated to contribute to the Pension Fund (R 80, 97, 191-2; PX 7-19).

**E.    Facts Relating to Pension Fund Documents.**

81. When a collective bargaining agreement is initially submitted to the Pension Fund, it is reviewed by the Contracts Department which enters the stated initial term into the

Pension Fund's computer system. The date specified as the last day of the initial term of the contract is entered as the "Cont[ract] Expire Date", even though the contract may rollover pursuant to an Evergreen Clause (R 211-12; p. 435 of DX F). This date is entered at the time the contract is processed by the Contracts Department which is typically long before the initial term of the agreement could end (R 211-12). For example, the 1980 Agreement was received by the Contracts Department on May 7, 1982 (p. 6 of PX 1) so at or about that date, the "Cont[ract] Expire Date" of June 30, 1983 was entered in the Pension Fund's computer, even though the 1980 Agreement contained an Evergreen Clause.

82. The Pension Fund's computer also separately reflects the "Contract Status" of an employer's agreement (R 209; DX F). If an employer terminates its obligation to contribute to the Pension Fund, the computer screen shows the employer's contract status as "Terminated", if an employer has not terminated its obligation to contribute, the computer indicates that the "Contract Status" is "Active". (R 212). In addition, if an employer has terminated its obligation to contribute to the Pension Fund, the computer indicates a "withdrawal code" other than "01" and reflects the date of the employer's withdrawal (R 211-12; p. 435 of DX F). The withdrawal information appears in connection with the assessment of withdrawal liability.

83. After the earliest expiration date of a collective bargaining agreement is reached, the Pension Fund does not perform an independent investigation to determine whether the contract is continuing pursuant to an Evergreen Clause because it is not cost effective for it to do so (R 220).

84. On May 4, 1999, the Pension Fund's ICON screen showed that the Defendants' "Contract

Status" was "Active", its withdrawal code was "01" and its withdrawal date was a fall back date of 0/1/01 (p. 435 of DX F). This means that as of May 4, 1999, the Pension Fund's records did not indicate that Kabbes and Effingham's contractual obligation to contribute to the Pension Fund had terminated (R 209, 211-13; p. 435 of DX F).

85. At the same time, the Pension Fund's computer records showed that the "Cont[ract] Expire Date" of April 30, 1992 (pp. 430, 433 and 435 of DX F). This occurred as a result of the earliest expiration date being entered on the computer in May 1992 when the 1983 Extension Agreement and the 1989 Extension Agreement were processed and does not indicate that the Pension Fund believed that Kabbes and Effingham's contracts had expired (R 209-13). It simply reflects that the earliest possible expiration date had passed.

86. Ultimately the term "expired" and "terminated" do not have the same meaning to the Pension Fund. In the Pension Fund's view, an agreement that has passed its earliest expiration date is "expired" even though it rolls over from year to year under an Evergreen Clause. On the other hand, if an agreement has been properly terminated and the parties' bargaining relationship is ended, the Employer is designated as "Terminated" on the Pension Fund's records (R 211-12). It is apparent that Local 26 also shares this understanding since it advised the Pension Fund that Kabbes and Effingham's contracts had "expired" but it assumed they had rolled over under the Evergreen Clause (p. 620 of DX M).

87. The Pension Fund's records also showed that from June 30, 1983 through at least September 6, 1988, the Collective Bargaining Agreement between Local Union 26 and Kabbes and Effingham had "expired" (DX B & D). This was not changed until 1992

when the 1983 Extension Agreement and the 1989 Extension Agreement were received by the Pension Fund (R 209-13; DX B & D). During this 9-year period from June 30, 1983 through April 30, 1992, Kabbes and Effingham continued to contribute to the Pension Fund and the Pension Fund accepted the contributions and provided pension credit to the covered employees (R 70, 97, 129-30, 136, 191-92, 214; PX 7-19, 37, 38; DX F).

88. Just like it did not believe the Defendants' obligation to contribute ended when the Pension Fund's computer records began to reflect a "Contract Status" of "Expired" from June 1983 to April 1992, the Pension Fund has never believed that the Defendants' labor agreements with Local 26 terminated in 1992 (R 60, 70, 80, 97, 100, 247 and pp. 436, 447 of DX F). The Pension Fund has always believed that agreements have rolled over from year to year under the Evergreen Clauses of the 1980 Agreement and the 1983 Agreement (R 70, 191-92; p. 636 of DX K; p. 620 of DX M).

89. The fact that the Pension Fund does not believe that the Defendants' obligation to contribute has ceased is also established by the fact that the Pension Fund has never assessed withdrawal liability (p. 623 of DX M).

**F.    Facts Relating To Single Employer Issue.**

90. Both Kabbes and Effingham are engaged in the trucking industry with a principal business address of 1601 West Wabash Avenue, P.O. Box 307, Effingham, Illinois 62401 (R 116).

91. Kabbes and Effingham perform primarily the same work (DX K).

92. Kabbes and Effingham both spread materials at job sites (R 144, 282).

93. Kabbes and Effingham both stockpile materials at job sites (R 282; PX 26).

94.   Kabbes and Effingham both deliver materials to job sites (R 282;  PX 26).

95.   Kabbes and Effingham use the same types of trucks (PX 26).

96.   When a job bid comes in, whichever company is available to do the work will get the job, and the work is interchangeable (PX 26).

97.   The property known as 1601 West Wabash Avenue, Effingham, Illinois, is owned by Effingham Asphalt (R 116).

98.   During the 1990's, John and Richard Kabbes delegated much of the day-to-day management of Kabbes Trucking to Richard Goldstein (R 119, 163).

99.   During the 1990's much of the day-to-day operations of Effingham were  delegated to Richard Goldstein (R 119).

100.  Kabbes and Effingham share the same business telephone number (R 116).

101.  Effingham office employees answer the phone  and set up jobs for Effingham and Kabbes, without distinguishing between their work for the two entities (R 117-120).

102.  Effingham's office manager, Jane Sudkamp, performs work for both Kabbes and Effingham, but is only paid wages from Effingham (R 117, 285, 286).

103.  After Goldstein died, Jane Sudkamp's duties have included the preparation of contribution reports, for both Kabbes and Effingham, that are submitted to the Pension Fund (R 135, 136).

104.  General office supplies purchased by Effingham are used by both Effingham and Kabbes, but the cost of these supplies is paid solely by Effingham (R 286, 287).

105.  These costs are not allocated between Effingham and Kabbes (R 119, 120, 287).

106.  Effingham pays the phone bill and the electric bill for 1601 West Wabash (R 117-118).

107.  Seventy (70%) or seventy-five (75%) percent of Kabbes' work is performed for

Effingham (R 154).

108. For the period at issue, medical insurance for those employees of Kabbes for whom contributions were not paid to the Illinois Conference of Teamsters Welfare Fund, was provided under a policy with Pekin Insurance that is issued in the name of Effingham Asphalt (R 127-128, 283).

109. Drivers for Kabbes and Effingham are paid at the same wage rate (R 126).

110. Union and non-union drivers for Kabbes and Effingham are paid at the same wage rate (R 126, 127).

111. The duties of union and non-union drivers are the same (R 127).

112. Kabbes does not reimburse Effingham for services rendered by Effingham employees, for rent or for general office supplies (R 119-120).

113. Neither Kabbes nor Effingham keep any records of the value of services provided by Effingham to Kabbes (R 156-159).

114. Neither Kabbes nor Effingham keep any records of any payment or benefit given by Kabbes to Effingham for services rendered or expenses (R 156-159).

115. John Kabbes handles the union negotiations on behalf of Kabbes and Effingham (R 120).

## CONCLUSIONS OF LAW

## I. JURISDICTION.

i. Section 306(a) of the Multiemployer Pension Plan Amendments Act of 1980, adding § 515 to ERISA, provides:

> Sec. 515. Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

ii.     Under 29 U.S.C. § 1132(e)(1), this Court has jurisdiction over the Pension Fund's suit to

collect contributions allegedly owed by Effingham and Kabbes under the collective

bargaining agreements and the Pension Fund Trust Agreement.

## II.     CONTRACTUAL LIABILITY.

### A.     Liability For The Period Prior To April 30, 1992.

i.      Kabbes does not dispute its contractual obligation to contribute to the Pension Fund

through April 1992 under the 1989 Extension Agreement. Therefore, there is no dispute

about Kabbes' liability for contributions on behalf of Douglas Kinkelaar at least for the

period of October 21, 1990 through April 30, 1992.

### B.     Liability For Contributions After April 30, 1992.

ii.     An employer can contribute to a multiemployer trust fund such as the Pension Fund only

if the basis upon which the payments are being made is specified in a binding written

agreement. 29 U.S.C. §186(c)(5); Central States Pension Fund v. Gerber Truck Service,

Inc., 870 F.2d 1148, 1153-54 (7th Cir. 1989) (en banc). However, the written agreement

does not have to be a collective bargaining agreement. Id. For example, this Court has

previously held that the Pension Fund's Trust Agreement is sufficient to obligate an

employer to contribute to the Pension Fund after collective bargaining agreement

termination. Central States Pension Fund v. Beelman Truck Co., 653 F.Supp. 678, 680

(N.D. Ill. 1987) (Norgle, J.). The Seventh Circuit has also held that the writing requiring

contributions does not have to be a collective bargaining agreement. Gariup v. Birchler

Ceiling Co., 777 F.2d 370, 375 (7th Cir. 1985). Further, the written agreement does not

have to be a signed agreement; all that is required is that there be sufficient conduct to

manifest an intent to be bound to a writing. Capitol-Husting Co. V. NLRB, 671 F.2d 237,

243 (7th Cir. 1982).

iii.    The Pension Fund has advanced three theories in support of its claim that the Defendants were contractually obligated to contribute to the Pension Fund for the disputed period of April 1992 through June 2003. First, they maintain that both Kabbes and Effingham are bound by the pension clause of the 1980 Agreement, the 1983 Extension Agreement and the 1989 Extension Agreement by virtue of the Certification Clause contained on the reporting forms submitted by the Defendants. Second, the Pension Fund argues that the 1980 Agreement and the 1983 Extension Agreement has never terminated and continue in effect to this day. Third, the Pension Fund contends that the Defendants adopted the provisions of the 1980 Agreement, the 1983 Extension Agreement and the 1989 Extension Agreement through their course of conduct.

iv.    In evaluating the Pension Fund's theories, it is important to remember that the federal courts are to liberally apply contract law in determining whether an enforceable labor agreement exists in order to effectuate federal labor and pension policies. Capital-Husting, 671 F.2d at 242; Trustees of Atlanta Iron Workers Pension Fund v. Southern Stress Wire Co., 724 F.2d 1458, 1459 (11th Cir. 1983). The primary policy relevant in this case is the objective of ERISA and the NLRA of insuring that the Defendants' employees receive promised benefits. 29 U.S.C. § 1001(a), Gariup, 777 F.2d at 375. If the Defendants' assertion that they have no contractual obligation to contribute to the Pension Fund is accepted, this goal will be frustrated because the pension credit earned by the Defendants' employees from April 1992 through the present must be cancelled. Moriarty v. Larry G. Lewis Funeral Home Directors, Ltd., 150 F.3d 777, 776-77 (7th Cir. 1998). As shown above, the benefit reductions would have a catastrophic effect on the

Defendants' employees. Moreover, Defendants never questioned the existence of their liability and the Pension Fund reasonably believed that there was a contractual basis for the payment of contributions. As a result, the Defendants paid contributions and the Pension Fund provided pension credit to the Defendants' employees and it has paid pension benefits to retired employees based upon the contributions. It is not fair to the Pension Fund or the Defendants' employees for the Defendants to now belatedly assert there is no contract.

v. Four other factors also significantly undercut the Defendants' contract defense. First, under the NLRA, it is a criminal offense punishable by a fine and imprisonment for an employer to remit contributions to a fund such as the Pension Fund unless there is a contract that requires the contributions. 29 U.S.C. § 186(c)(5)(B) and (D). The Defendants continued to remit contributions to the Pension Fund after April 1992 – in fact, they continued to remit contributions after they asserted their contract defense in this case through the date of trial. The Court will not lightly infer the commission of a felony by the Defendants.

vi. Second, the Defendants never disputed the existence of a contract requiring contributions until after this case was filed. It is true that they refused to pay the contributions revealed to be owed by the audit but that was because they believed that their liability was limited to employees who were union members. Only after the Defendants learned that the union membership defense was invalid under controlling authority, Gerber Truck, 870 F.2d at 1150; Central States Pension Fund v. Central Cartage Co., 69 F.3d 1312 (7th Cir. 1995), did they devise the contract defense. It is clear the contract defense is merely a pretext to get around the invalidity of the union membership defense.

vii.    Third, the Defendants admit that they wanted to contribute to the Pension Fund on behalf of all of the individuals included in the Pension Fund's audit, but they have now inexplicitly changed their minds.

viii.    Fourth, it is significant that the Defendants have not filed a counterclaim seeking the return of the contributions they paid after April 1992. As indicated above, the credit earned by the Defendants' employees after April 1992 must be cancelled if there was no contract. Larry T. Lewis Funeral Directors, Ltd., 150 F.3d at 776-77. If the Defendants really believed that there was no contract, they would have filed the mandatory counterclaim seeking the return of the contributions they paid after April 1992.

### 1.    The Certification Clause obligated the Defendants to contribute after April 1992.

ix.    An employer can be contractually obligated to contribute to a fund after collective bargaining agreement termination under plan documents such as a trust agreement, Central States Pension Fund v. Beelman Truck Co., or a participation agreement. Central States Pension Fund v. Behnke, Inc., 883 F.2d 454 (6th Cir. 1989). Further, an employer can create a right to provide fringe benefits that survives termination of a collective bargaining relationship. See, e.g, Bidlack v. Wheelabrator Corp., 993 F.2d 603 (7th Cir. 1993) (en banc) (employer can be obligated to provide retiree health benefits after end of bargaining relationship).

x.    Under the Certification Clause contained on the billing forms submitted to the Pension Fund, the Defendants reaffirmed their obligation to contribute to the Pension Fund. This very same Certification Clause has been held to bind an employer to contribute to the Pension Fund after termination of a collective bargaining agreement. Central States Pension Fund v. Joe McClelland, Inc., 1993 WL 243409 (N.D. Ill. 1993), aff'd 23 F.3d

1246 (7th Cir. 1994) (copy attached as Exhibit A), see also, Operating Engineers Local 139 Benefit Fund v. Gustafson Construction Co., 258 F.3d 645, 650 (7th Cir. 2001) (The certification clause is "boilerplate . . . but it was entitled to some weight . . . and maybe a lot, as we suggested in Moriarty v. Larry G. Lewis Funeral Directors, Ltd., 150 F.3d 773, 775 (7th Cir. 1998). People generally are held to the agreements they sign and are not permitted to fob them off as 'boilerplate' without invoking fraud, unconscionability or material mistake."). Other courts have also held that payment of contributions in accordance with a certification clause creates an enforceable contractual duty to pay contributions. Central Pennsylvania Teamsters Pension Fund v. Frey's Motor Express, Inc., 1994 WL 2533 (E.D. Pa 1994) (copy attached as Exhibit B); Laborers Pension Fund v. E. Guerra Co., 2000 WL 1349148 (N.D. Ill. 2000) (copy attached as Exhibit C); Chicago Tile Institute Pension Fund v. Picha Tile Co., 1995 W 584231 (N.D. Ill. 1995) (copy attached as Exhibit D); Trustees of the Flint Michigan Laborers Pension Fund v. In-Puls Const. Co., 835 F.Supp. 972 (E.D. Mi. 1993); Trustees of the Hotel Motel & Restaurant Employees Fund v. Wright, 1985 WL 17678 (W.D. Wa. 1985) (copy attached as Exhibit E); Weber v. Anspach, 473 P.2d 1011 (Or. Sup. Ct. 1970).

xi.   The Defendants cite a number of cases where the courts indicated that an employer did not adopt a collective bargaining agreement by merely remitting contributions to a fund. These cases are easily distinguishable because there was no certification clause mentioned in any of the cases cited by the Defendants. Caporale v. Mar Les, Inc., 656 F.2d 242 (7th Cir. 1981); Carpenters Amended Health Benefit Fund v. Holleman Construction Co., 751 F.2d 763 (5th Cir. 1981); Moglia v. Geoghegan, 403 F.2d 110 (2nd Cir. 1968); Brown v. Dominic Prisco Transport, Inc., 1997 U.S. Dist. LEXIS 23709

(E.D. N.Y. 1997); Sullivan v. Cirone, 1995 U.S. Dist. LEXIS 874 (N.D. Ill. 1995);

Bevona v. Galbreath-Ruffin Co., 690 F.Supp. 234 (S.D. N.Y. 1988); IGLWU Retirement

Fund v. Levy Bros. Frocks, Inc., 1987 U.S. Dist. LEXIS 7731 (S.D. N.Y. 1987), reversed,

846 F.2d 879 (2nd Cir. 1988); Giordono v. Jones, 1987 U.S. Dist LEXIS 13227 (N.D. Ill.

1987) aff'd 867 F.2d 409 (7th Cir. 1989); Robbins v. Mainline Hauling Co., 590 F.Supp.

1050 (E.D. Mo. 1984).

xii.     The Defendants also argue that the Certification Clause is not a sufficient basis for the

Pension Fund's claims for four reasons, none of which have merit. First, the Defendants

argue that the clause is insufficient to obligate them to contribute to the Pension Fund

because there is evidence that they were not in compliance with the other provisions of

the labor agreement and the union allegedly agreed that the collective bargaining

relationship had ended. The Defendants assert that the payment of contributions in

accordance with a certification clause is only one factor to be considered in determining

whether an employer has adopted a labor contract which can be overcome by other

evidence, such evidence of its non-compliance with other provisions of the collective

bargaining agreement.

xiii.    The alleged termination of the collective bargaining relationship is irrelevant because an

employer can agree to pay contributions after the relationship ends. Bidlack v.

Wheelabrator.[2]

xiv.     Nor is it necessary for the Court to decide whether a certification clause alone is sufficient

---

[2]      Of course, either the Pension Fund or the Defendants could decide that it does not
want to continue a month-to-month relationship, but that has not yet occurred in this case
since the Defendants continue to pay and the Pension Fund continues to accept their
payments, and as shown below the Defendants remain obligated to contribute under the
collective bargaining agreements.

to adopt a collective bargaining agreement in its entirety because the unique language in the certification clause in this case only required the Defendants to adopt the pension clause of the labor agreements and did not require adoption of the labor agreements in their entirety. Since the Certification Clause did not incorporate the labor agreements as a whole, evidence that the Defendants failed to comply with other provisions of the collective bargaining agreement is irrelevant. The only relevant evidence is that each month, the Defendants reaffirmed the duty to contribute to the Pension Fund in accordance with the labor agreements and paid contributions to the Pension Fund thereby creating a contractual obligation limited to the duty to contribute to the Pension Fund.

xv. Second, the Defendants dismiss the Certification Clause as "boilerplate." However, it does not invoke fraud, unconscionability or material mistake, so it cannot avoid the Certification Clause for this reason. Operating Engineers Local 130 Fund v. Gustafson Const., Co., 258 F.3d at 650. Moreover, the Certification Clause is actually critically important to participating employers, employees and the Pension Fund. Absent an affirmation of liability, it may be a crime for am employer to make payments and a fund to accept employer payments; the Certification Clause eliminates any doubt about the legality of payments by creating a contractual commitment between the employer and the Pension Fund. This contractual commitment eliminates the risk of erroneous benefit payments by the Pension Fund and insures that employee expectations are not frustrated (as they will be in this case if the Defendants' defense is accepted). Further, the Certification Clause reduces the Pension Fund's litigation costs by eliminating the need to litigate the issue of whether an employer that has contributed to the Pension Fund (like the Defendants) was contractually required to do so (which is good for both employers

and employees because it means more money is available for benefits at lower contribution rates). Since the Certification Clause is critically important to the Pension Fund as well as employers and employees, and certainly is not unconscionable, it should be enforced. Id.

xvi.  The Defendants' third argument about the Certification Clause is based upon the decision in Caporale v. Mar Les, Inc., 656 F.2d 242 (7th Cir. 1981). In Mar Les, a non-union employer signed two memorandums of understanding that incorporated an industry wide collective bargaining agreement, but the employer never received a copy of the collective bargaining agreement. Over a two year period, the employer paid contributions to the union fund on behalf of only one of its 10 employees. The Seventh Circuit held that there was no mutual assent to the labor contract because a copy was never delivered to the employer so it did not know the terms of its undertaking and the employer did not comply with any of the terms of the agreement other than partial compliance with the obligation to contribute to the Pension Fund.

xvii.  The Mar Les decision is easily distinguishable because it was brought under the LMRA, not ERISA. 656 F.2d at 242-3. In subsequent decisions, the Seventh Circuit has repeatedly held that an employer's claim that it did not subjectively believe that it had a contract is not a valid defense in an ERISA trustee suit like this case because § 515 of ERISA makes such funds "like a holder in due course in commercial . . . entitled to enforce the writing [it receives] without regard to understanding or defenses applicable to the original parties." Gerber, 870 F.2d at 1149, see also, Robbins v. Lynch, 836 F.2d 330 (7th Cir. 1988). Mar Les was not an ERISA case, so while the decision may still be valid in a suit between a union and employer, it does not apply to a trustee suit under ERISA to

collect delinquent contributions. Giordono v. Jones, 867 F.2d 409, 416 (7th Cir. 1989)

(Easterbrook, J. concurring) (district court's determination that funds contribution claims

was barred under almost identical fact pattern and legal claims as Mar Les, was wrong

under Robbins v. Lynch); Illinois District Council of Bricklayers v. R & R Masonry, Inc.,

1996 WL 627635 *4 n.7 (N.D. Ill. 1996). (While Mar Les appears to be viable in suit

between unions and employers, "Mar Les repeatedly has been questioned, criticized

and/or ignored in the context of suits brought by funds to recover unpaid contributions")

(copy attached as Exhibit F); Divane v. Krull Electric Co., 1996 WL 41686 *3 (N.D. Ill.

1996) ("[T]he continued precedential value of Caporale [v. Mar Les] may be questionable

in light of [the] more recent (although distinguishable) cases [of] ... Gerber Truck

[and] ... Robbins v. Lynch") (copy attached as Exhibit G); Carpenters Fringe Benefit

Fund v. Able Bros. Const., 813 F.Supp. 643, 649 (N.D. Ill. 1993) ("[I]n light of ...

holdings in [Robbins v.] Lynch [and] Gerber Truck ... the value of Caporale [v. Mar Les]

is questionable"); Murphy v. Gullo Int'l. Development Co., 1989 WL 51168 *2 (N.D. Ill.

1989) ("Mar Les has been often distinguished or ignored and seldom, if every followed ...

The present status of Mar Les is uncertain at best [due to] ... Gerber Truck ... [and]

Robbins v. Lynch" (copy attached as Exhibit H).

xviii.   Mar Les is also distinguishable for several reasons other than the statute under which the

case was filed. First, unlike the employer in Mar Les, the Defendants had a longstanding

relationship with the union and they did have a copy of the underlying labor agreements

so at the time they signed the Certification Clause, what they were agreeing to do was

clearly spelled out. Second, in Mar Les, there was no evidence of any certification clause

like the one at issue in this case so contrary to the Defendants' claim, Mar Les does not

indicate that such a clause cannot be enforced. Third, the memorandums of understanding in <u>Mar Les</u> incorporated the entire "lengthy contract" between the union and several contractor associations so the Court believed that evidence of non-compliance with the other provisions of collective bargaining agreement showed that there was no assent to the contract. 642 F.2d at 243. In this case, the Certification Clause only incorporates the duty to remit contributions to the Pension Fund, so evidence of the Defendants' non-compliance with the provisions of the collective bargaining agreement is irrelevant.

xix. The Defendants final argument is that the Certification Clause is not significant because they did not always sign the reporting forms. This argument has no merit because so many forms were signed that the Defendants clearly manifested their intent to be bound. Further, as noted above, the intent to be bound by an agreement does not necessarily require that an employer actually sign the agreement; all that is necessary is conduct which manifests the intent to be bound. <u>Capitol-Husting, Inc.</u>, 671 F.2d at 243. Even when the Defendants did not sign the reporting forms, they manifested their intent to be bound by the Certification Clause by completing the reporting forms and submitting their checks (which were signed) that paid the amounts that were revealed to be owed by the reporting form. In <u>Chicago Tile Institute Welfare Fund v. Picha Title Co.</u>, 1995 WL 54231 (copy attached as Exhibit D), the court held that the employer had manifested its intent to be bound by signing only 6 of 18 reporting forms. This Court agrees that the Defendants manifested their intent to be bound by the Certification Clause by completing the reporting form and remitting payment, regardless of whether the forms were signed.

xx. Since the Certification Clause created a valid contract between the Pension Fund and the

Defendants, the Defendants were obligated to contribute to the Pension Fund from April 1992 to June 2003.

xxi. The Pension Fund has not waived any theory of recovery based upon this theory. A complaint need not allege a particular legal theory. Albiero v. City of Kankakee, 122 F.3d 417, 419 (7th Cir. 1997). In this case, the Amended Complaint alleged that the Defendants had failed to accurately report work history for all covered employees and, therefore, delinquent contributions were owed. Legal theories supporting this wrong can be interchanged without altering the complaint.

xxii. In addition, the Defendants have always been fully aware of the Plaintiffs' theories of recovery including the Certification Clause claim.

### 2. Even If The Certification Clause Is Disregarded, The Defendants Were Obligated To Contribute Because The Labor Agreement Was Never Terminated.

xxiii. The Defendants claim that their contractual relationship with Local 26 ended April 30, 1992 and therefore, the Pension Fund cannot collect anything after that date. Termination of a contract is not presumed, and the Defendants bear the burden of establishing that termination occurred. Armour Co. v. Celic, 294 F.2d 432, 436 (2nd Cir. 1961). Moreover, § 515 of ERISA severely limits employer defenses in ERISA cases. 29 U.S.C. § 1145; Gerber Truck Co. The Defendants' termination defense is only available if the termination of the agreements is incontestable from the face of the agreement. Where, as here, the contract is either unclear or termination is disputed, § 515 of ERISA bars consideration of the contract termination defense. Carpenters Health & Welfare Trust v. Bla-Delco Const., Inc., 8 F.3d 1365, 1369 (9th Cir. 1993); Residential Roofers Welfare Fund of Philadelphia v. A & B Metal, Inc., 976 F.Supp. 341, 348 (E.D. Pa. 1997);

*Central States Pension Fund v. Steel Express, Inc.*, No. 99 C 877 (N.D. Ill. 2000) (copy attached as Exhibit I).

xxiv.  The Defendants argue that the termination defense can be considered because it is so obvious that the labor contracts terminated. This argument is based upon the 1989 Extension Agreement which does not contain an Evergreen Clause and provides that it would only "remain in effect and full force through April 30, 1992". However, this section of the 1992 Extension is captioned "Termination of this <u>Modified Extension</u>" (emphasis added) and nothing indicates that the underlying 1980 Agreement or the 1983-1989 Extension were also being terminated. Where "clear and specific language" is used in the termination clause of a labor agreement, the federal courts are uniform in their strict interpretation of such language." <u>Trustees of BAC Local 32 Ins Fund v. Fantin Enterprises, Inc.</u>, 163 F.3d 965, 969 (6th Cir. 1998). Here, the duration of the 1989 Extension Agreement clearly extinguishes only the Extension Agreement and does not effect the 1983 Extension Agreement or the 1980 Agreement. As indicated above, the 1983 Extension Agreement and the 1989 Extension Agreement were signed at the same time in 1992 (see, ¶ 16, infra.). The Evergreen Clause in the 1983 Extension Agreement requiring a written notice to terminate is meaningless if termination was automatic under the 1989 Extension Agreement as the Defendants contend. At best, the duration clause of the 1989 Extension Agreement is unclear and the Defendants' claim that the entire agreement (including the 1980 Agreement and the 1983 Extension Agreement) expired is not a valid defense to the Pension Fund's claim. <u>Bla Delco Const.</u>; <u>A & B Metal, Inc.</u>; <u>Steel Express, Inc.</u>

xxv.  The Defendants provided no evidence of the required written notice of termination of the

-35-

1983 Extension Agreement. Therefore, that agreement and the underlying 1980 Agreement must be presumed to be still in effect and obligate the Defendants to contribute to the Pension Fund.[3]

xxvi. The Defendants' claim that the termination of at least the 1980 Agreement is obvious based upon the April 15, 1986 letter from Local Union 26 to Kabbes. However, this letter was signed <u>before</u> either the 1983 Extension Agreement and the 1989 Extension Agreement were signed. Therefore, these agreements must supercede the April 15, 1986 letter. Moreover, the April 15, 1986 letter indicates that Local 26 sought to modify a collective bargaining agreement that purportedly expired on June 30, 1986. Neither the 1980 Agreement or the 1983 Extension Agreement expired on that date, so the notice could not possibly terminate those agreements.

xxvii. Further, the April 15, 1986 letter requesting contract modifications does not comport with the duration clauses of the 1980 Agreement, which indicates that termination will occur only if a notice indicated a desire to terminate the contract is service. A notice to terminate a collective bargaining agreement must be clear and explicit. <u>Louisiana Bricklayers Welfare Fund v. Alfred Miller Contracting Co.</u>, 157 F.3d 404, 409 (5th Cir. 1998); <u>Office & Professional Employees Local 42 v. United Automobile Workers Local 174</u>, 524 F.2d 1316, 1317 (6th Cir. 1975). The April 15, 1986 letter does not purport to cancel the contract, it merely invites Kabbes to negotiate modifications to some terms of

---

[3]     The Defendants assert that if this is true, the contribution rate must drop to the $16 rate contained in the 1980 Agreement, not the higher $24 rate set forth in the 1989 Extension Agreement. However, the Pension Fund's rules are incorporated in the 1980 Agreement, including the rule prohibiting employers from decreasing the contribution rate (R 270; § 3.01(a)(4) of PX 5). Therefore, even if the 1989 Extension Agreement terminated, the Defendants are contractually obligated to contribute at the higher $24 rate under the Plan documents.

the contract. Where, as here, the contract requires a notice of termination, a notice that does not purport to cancel the contract is ineffectual. Central States Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148, 1156 (7th Cir. 1989) (en banc); Office & Professional Employees Local 42 v. United Automobile Workers Local 174, 524 F.2d 1316, 1317 (6th Cir. 1975); Steel Express, at pp. 12-14 (Exhibit I); Luden's, Inc. v. Local Union No. 6, 805 F.Supp. 313, 322 (E.D. Pa. 1992 vacated on other grnds, 28 F.3d 347 (3rd Cir. 1994)); Central States, Southeast and Southwest Areas Pension Fund v. McLain Trucking, Inc., 1990 WL 141426 at *3 (N.D. Ill. Sept. 21, 1990) (copy attached as Exhibit J); In re: Eazor Express, Inc., No. 84-130 (Bkrcy. W.D. Pa. Dec. 5, 1985) (copy attached as Exhibit K).

xxviii.  The Defendants next argue that termination is obvious because the Pension Fund's computer records indicate the contract status was "expired." This very same argument was rejected by Judge Holderman in Steel Express for several reasons. First, whether the contract terminated is an issue of law so the Pension Fund's alleged legal opinion on the issue is irrelevant. Steel Express at p. 15 (Exhibit I). Indeed, the Pension Fund is not even a party to the labor contract so its alleged opinion could not be probative. Id. Because the contract language itself is clear, any alleged misunderstanding by the Pension Fund is irrelevant. Illinois Conference of Teamsters Welfare Fund v. Mrowicki, 44 F.3d 451, 459-60 (7th Cir. 1994). Further, the records relied upon by the Defendants do not even indicate that the Pension Fund believed that the contract was terminated. The "expiration" date for a labor contract is entered on the Pension Fund's computer records at the time the contract is received and after that date passes, the Pension Fund's computer records automatically reflect to the contract as "expired" regardless of whether there is an

Evergreen Clause. As a result, a contract that is designated as "expired" frequently has actually rolled over under an Evergreen Clause. What is really significant is the fact that the Pension Fund's records describe the Defendants' contract as "Active". Steel Express, at p. 15 (Exhibit I). Third, the date entry relied upon by the Defendants was made by a low level Pension Fund employee without any management responsibility and does not bind the Pension Fund. Id., see also, MCI Communications v. AT & T, 708 F.2d 1081, 1143 (7th Cir. 1983) ("opinions of [low level] employees without management responsibility are not properly considered to be admissions of the corporation.")

xxix. The Defendants' argument about the Pension Fund's computer record documents is ultimately based upon semantics only. There is no question that the initial term of the Defendants' extended contract "expired" by 1983, but because no notice of termination was sent, the agreement was renewed from year to year thereafter. As Judge Holderman held in Steel Express, the characterization of the contract as "expired" in the Pension Fund's records is not inconsistent with the Pension Fund's assertion that it was renewed each year after that date. Steel Express, Inc., at 15. The Pension Fund does not equate "expired" with "terminated" nor does Local 26 (see Fact Findings ¶ 86) and this understanding comports with the common labor law usage of these terms. See e.g., Trinidad Corp. v. National Maritime Union, District 4, 81 F.3d 769, 771 (8th Cir. 1996) ("'duration clause' labor provided that after the expiration date, the collective bargaining agreement would continue in effect from year to year"); Se-Ma-No Electric Co., 284 NLRB 1006, 1007 (1987) (Evergreen Clause "keeps the contractual terms in effect beyond the expiration date"); KWC Furniture Co., 247 NLRB 541 (1980) ("The April 1 expiration date passed without either party giving a notice of termination ... [so the

agreement] automatically renewed itself"); cf. Bright v. Coastal Lumber Co., 962 F.2d 365, 368 (4th Cir. 1992) (lease provided that "at the expiration of ... ten years the contract remains renewable from year to year").

xxx.   The Defendants also argue that it is obvious that the contracts terminated because Judge Scott held in Illinois Conference of Teamsters Welfare Fund v. Kabbes Trucking Co., Case No. 01-3297 at p. 54 (C.D. Ill. June 25, 2003) that "There is no issue of proper termination in this case because the 1989 [Extension Agreement], the last CBA which Kabbes Trucking was signatory, expired in 1992." This statement is dicta because the fund in that case did not seek to bind Kabbes to the 1989 Extension Agreement, but instead to significantly higher contribution rates that were required by the 1995-1998 and 1998-2001 labor contracts that had been paid by the Defendants ($2.50 per hour vs. $4.36 per hour). Moreover, Judge Scott clearly misread the 1989 Extension Agreement – as noted above, the duration clause of the 1989 Extension Agreement indicates that it was the only writing that would have ended in 1992. She was also unaware of the fact that the 1983 Extension Agreement was signed at the same time as the 1989 Extension Agreement so her reading would improperly render the duration clause of the 1983 Extension Agreement surplusage. Thus the dicta in that case should not be followed.

xxxi.   Ultimately, there is no evidence supporting the Defendants' claim that the 1980 Agreement or the 1983 Extension Agreement had terminated. Therefore, these contracts remain in effect and mandate payment of the contributions sought by the Pension Fund. Alternatively, termination has certainly not been clearly established so the termination defense is barred by § 515 of ERISA. Bla-Delco, Inc.; Steel Express.

**C. The Defendants Have Reaffirmed The Collective Bargaining Agreements Through Their Course Of Conduct.**

As indicated above, an employer can adopt a labor contract through its course of conduct. Capitol Husting, Inc. Kabbes and Effingham have adopted the 1989 Extension Agreement (and the underlying 1980 Agreement) and the 1983 Extension Agreement by

      a.    Remitting contributions to the Pension Fund through the present date in accordance with the Certification Clause;

      b.    Remitting contributions to the Illinois Conference of Teamsters Welfare Fund until 2000;

      c.    Cooperating with the audit in accordance with the trust agreement which was incorporated in the 1980 Agreement; and

      d.    Indicating that they desired to provide pension benefits to their employees.

It is not necessary for the Pension Fund to show that the Defendants adopted the contract in their entirety – an employer can adopt through its conduct parts os an agreement such as the pension clause, Local 9925 W/F v. Sunbelt Sales, Inc., 932 F.Supp. 1135, 1141 (M.D. Fla. 1990) aff'd, 932 F.2d 977 (11th Cir. 1991). Cf., Caporale v. Mar Les, Inc. (recognizing existence of limited contractual obligation to contribute to a fund). At a minimum, the above conduct demonstrates that the Defendants adopted the pension clause of the labor agreements. Therefore, they are contractually obligated to remit the contributions sought by the Pension Fund.

**D. Effingham Is Liable For Contributions Under Kabbes' Contracts Because Kabbes And Effingham Are A Single Employer.**

xxxii. This Court has jurisdiction to determine whether the terms of Kabbes Collective Bargaining Agreement should be applied to the employees of Effingham. There is no dispute concerning union representation, nor are there allegations of unfair labor

practices. Larry G. Lewis Funeral Directors, Ltd., 150 F.3d at 775; Moriarty v. Svec, 164
F.3d 323, 334 (7th Cir. 1998).

xxxiii. Alternatively, if Effingham is not bound by a Collective Bargaining Agreement because
the parties have not located copies of these Agreements, it is bound by Kabbes'
Agreements (i.e., the 1980 Agreement, the 1983 Extension Agreement and the 1989
Extension Agreement) because it is a single employer with Kabbes. These entities share
common management and common ownership and have an interrelation of operations
and a centralized control of labor relations. Thus, Kabbes and Effingham are a single
employer and Effingham is obligated to make contributions to the Pension Fund to the
same extent as Kabbes. Moreover, because Kabbes and Effingham are a single employer,
they are both jointly liable for the full amounts owed to the Pension Fund by both entities.

## III.    LACHES DEFENSE IS WITHOUT MERIT.

### A.    Laches Does Not Apply To A Claim By A Multiemployer Plan For Contributions Under ERISA.

xxxiv. ERISA does not mention equitable defenses such as laches. While the federal courts
have the power to create federal common law, this can occur "only where the federal
statute does not expressly address the issue before the court [and only if the proposed
common law] is consistent with the policies underlying the federal statute in question."
Nachwalter v. Christie, 805 F.2d 956, 959-60 (11th Cir. 1986); cf. Upholsterers' Union
Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1327 (7th Cir. 1990)
(common law "successorship" liability doctrine created based upon the "congressional
policies underlying ERISA"). Laches is a species of estoppel. Teamsters Employees
Welfare Fund v. Gorman Bros. Ready Mix, 283 F.3d 877 (7th Cir. 2002). Where the
proposed common law is estoppel, it is necessary to examine the relevant statutory

provisions and objective with particular care because "rules of estoppel will not be permitted to thwart the purposes of the statutes of the United States." <u>Kaiser Steel Corp. v. Mullins</u>, 455 U.S. 72, 81 n.6 (1982). The defense of laches should not be created in ERISA contribution cases because the defense is inconsistent with the language of ERISA and the LMRA and will frustrate the policies underlying the statutes.

xxxv. As noted above, Section 302(c)(5) of the Labor Management Relations Act prohibits payments by employers to multiemployer funds unless "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5). Section 302 mandates that written fringe benefit promises be enforced as written to prevent "corruption of collective bargaining through bribery of employee representatives by employers, extortion by employee representatives, and the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." <u>Arroyo v. United States</u>, 359 U.S. 419, 425-26 (1959). Based upon Section 302(c)(5), the Supreme Court indicated in <u>NLRB v. Amax Coal Co.</u>, 453 U.S. 322 (1981), that trustees of multiemployer funds are powerless to modify an employer's written pension promises:

> The management-appointed and union-appointed trustees [of multiemployer funds] do not bargain with each other to set the terms of the employer-employee contract; *they can neither require employer contributions not required by the original collectively bargained contract, nor compromise the claims of the union or the employer with regard to the latter's contributions.* Rather, the trustees operate under a detailed written agreement, 29 U.S.C. § 186(c)(5)(B) ... Indeed, the trustees have an obligation to enforce the terms of the Collective Bargaining Agreement regarding employee fund contributions against the employer "for the sole benefit of the beneficiaries of the fund."

<u>Id</u>. at 336-37 (emphasis added). Since Section 302(c)(5) eliminates the authority of trustees to explicitly agree to a reduction or cancellation of an employer's pension contribution obligation,

the trustees cannot possibly forfeit their ability to collect a promised payment because of their conduct (or inaction).

xxxvi. ERISA also imposes strict duties upon trustees including the duty to operate the funds in strict conformity with the governing writings. Central States Pension Fund v. Central Transport, Inc., 472 U.S. 559, 572-73 (1985); see also, Prohibited Transaction Exemption 76-1, 41 Fed. Reg. 12740 (Trustees who fail to collect promised contributions from a solvent employer violate prohibited transactions provisions of ERISA). Like the LMRA, the ERISA written agreement requirement prohibits trustees from explicitly forgiving an employer's written contribution promises so the liability cannot be excused by virtue of the trustees' conduct.

xxxvii. Additionally, the creation of equitable defenses will undermine Congress' goal of insuring the solvency of multiemployer funds. With ERISA, Congress sought to protect "the continued well-being and security of millions of employees and their dependents" by establishing "minimum standards ... assuring the equitable character of such plans and their financial soundness." 29 U.S.C. § 1001(a). Congress' objective was to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually will receive it." Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 375 (1980). Section 302(c)(5) of the LMRA is also designed to insure the employees actually receive promised benefits. Gariup v. Birchler Ceiling Co., 777 F.2d 370, 375 (7th Cir. 1985).

xxxviii. When it added Section 515 to ERISA in 1980, Congress sought "to alleviate

certain problems which tend to discourage the maintenance and growth of multiemployer plans." 29 U.S.C. §§ 1001(a)(1) and 1001(c)(2). Congress indicated that unpaid employer contributions as well as the lengthy, complex and costly litigation that was required to collect promised payments was a "serious problem" and a principal cause of the financial instability of multiemployer funds.[4] To alleviate this problem, Congress "gave statutory status to employers' contribution duties under multiemployer plans," Artistic Furniture, 920 F.2d at 1328, and substantially narrowed the range of available employer defenses in order to enhance accurate actuarial planning and reduce the costs associated with employer delinquencies. Central States Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148 (7th Cir. 1989) (en banc). Further, the sponsors of § 515 explicitly endorsed the decision in Lewis v. Mill Ridge Coals, 298 F.2d 552 (6th Cir. 1962) where the court held that defenses based upon alleged trustee misconduct could not be recognized, thereby further demonstrating that Congress intended Section 515 to foreclose defenses premised upon fund conduct. 126 Cong. Rec. 23039, August 25, 1980 (Rep. Thompson); 126 Cong. Rec. 23288, August 26, 1980 (Sen. Williams).

xxxix. Congress' explicit desire to protect employee expectations and assure the financial soundness of funds cannot be reconciled with the creation of equitable defenses to trustee collection suits. Such defenses are premised upon the assumptions that: (1) the employer is contractually obligated by its collective bargaining agreements to pay the contributions

---

[4] Staff of Senate Committee on Labor and Human Resources. 96th Cong. 2d Sess. S1076, the Multiemployer Pension Plan Amendments Act of 1980, Summary of Analysis and Consideration at 43-44 (Comm. Print 1980).

sought by the fund but (2) the equitable doctrine relieves the employer of the duty to pay. The Seventh Circuit recognized in <u>Gerber Truck</u> that it is the Department of Labor's view that a defined benefit pension plan such as the Pension Fund must provide pension credit to employees regardless of whether employers fulfill their duty to pay corresponding contributions. 870 F.2d at 1153. Thus, if equitable defenses are allowed and proved, ERISA funds will probably be required to pay benefit claims without receipt of the corresponding contribution payment. Ultimately, the shortfall will be borne by other employers. Such a result will certainly undermine the financial soundness of multiemployer funds which ERISA and the LMRA were designed to foster.

xl. <u>Teamsters & Employers Welfare Trust of Illinois v. Gorman Brothers Ready Mix</u>, 283 F.3d 877 (7th Cir. 2002) suggested that a defense of laches could apply to an ERISA claim for contributions. However, that Court relied upon the fact that the plan in that case had failed to point to any plan language that would be violated by the invocation of laches. <u>Id</u>. at 883.

xli. Here, the Defendants' laches defense must be rejected because it is inconsistent with the provisions of the trust agreement requiring Kabbes and Effingham to pay all required contributions to the Pension Fund and requiring the Trustees to collect all contributions owed to the Pension Fund.

xlii. In addition, as noted by the Teamsters dissent, the parties in that case did not brief the issue of whether courts may decline to enforce the terms of an ERISA plan based on equitable grounds. <u>Id</u>. at 888.

**B.   Kabbes And Effingham Have Not Established The Elements Of Laches.**

xliii. Laches requires a showing of unreasonable delay in filing suit and prejudice to the

defendant as a result of the unreasonable delay.  Gorman Bros. Ready Mix, 283 F.3d at 880.  To establish laches, the Defendants must show that the Pension Fund did something to reasonably induce them into believing that they would not be sued.  Id. at 882.  As shown above, the Pension Fund was unaware of its claim until the audit in December 2000 and suit was filed in March 2002.  The Pension Fund demanded payment in January 2001 (PX 29) and followed up with phone calls seeking payment (R 174-5).  The Defendants could not possibly have reasonably believed that the claim had been dropped after only 15 months so it did not unreasonably delay in filing suit.

xliv.  Further, the laches defense fails because the Defendants' failure to pay the contributions at issue in this case had nothing to do with the Pension Fund's delay.  At no time did the Pension Fund ever suggest to the Defendants that it would not collect the contributions at issue in this case.  Instead, the Pension Fund demanded payment (PX 29) and followed up with demands for payment (R 174-5).

xlv.  Moreover, the reliance of the Defendants on the Pension Fund's delay must be reasonable.  Gorman Bros. Ready Mix, 283 F.3d at 883-84.  As direct parties to the collective bargaining agreements, the Defendants could not have reasonably relied on the Pension Fund's silence when the collective bargaining agreement and controlling law establish that contributions must be paid on all employees regardless of union membership status.  cf.  Central States Pension Fund v. Kroger Co.. 226 F.3d 903, 915 (7th Cir. 2000) (rejecting estoppel defense because "Kroger, the party asserting estoppel, obviously knew of its practice of designating the [permanent] employees in question as [ineligible] casuals and, therefore, it was in a better position than the Fund to know the truth that its practice did not comport with the CBA.") 226 F.3d at 915.

xlvi.  Nor can the Defendants establish prejudice as a result of any delay caused by the Plaintiffs. They claim prejudice as a result of statements attributed to Goldstein which they now claim are inaccurate. They claim that as a result of Mr. Goldstein's subsequent death, his testimony related to the audit is unavailable to them. The only alleged inaccurate statements by Goldstein relate to the representations he made to the Pension Fund's auditors concerning the relationship between Kabbes and Effingham so there could only be prejudice if the court rules in the Pension Fund's favor based upon the single employer doctrine. Since the court believes that Effingham is obligated to contribute based upon the Certification Clause and its admission that it signed the same contracts as Kabbes that were not terminated, there is no prejudice at all.

xlvii.  Further, any prejudice sustained by the Defendants has been caused by their own acts, rather than any delay of the Plaintiffs. The Defendants delegated to Goldstein the duty to assist with the audit with the knowledge of his serious medical condition. The audit was conducted in December 2000 and the findings provided to the Defendants in January 2001. Goldstein continued working for the Defendants until at least the middle of April 2001. The Defendants took no steps to question him concerning statements or information he provided to the Pension Fund in relation to the audit in the 4 months following the audit, or the 3 months following the audit findings, even though they knew the Pension Fund was demanding payment. Goldstein was available to the Defendants during this entire time. Any prejudice that is caused by their inability to question him now is the result of their own conduct.

## IV. DAMAGES.

Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2), provides:

(2)  In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan –

(A)  the unpaid contributions,

(B)  interest on the unpaid contributions,

(C)  an amount equal to the greater of --

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D)  reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E)  such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

xlviii.  The Pension Fund trust agreement provides that:

Non-payment by an Employer of any moneys due shall not relieve any other Employer from his obligation to make payment.  In addition to any other remedies to which the parties may be entitled, an Employer shall be obligated to pay interest on any contributions, withdrawal liability or other moneys due to the Trustees from the date when the payment was due to the date when the payment is made together with all expenses of collection incurred by the Trustees, including, but not limited to, attorneys' fees and such fees for late payment as the Trustees determine and as permitted by law.  The interest payable by an Employer, in accordance with the preceding sentence, shall be computed and charged to the Employer at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by Chase Manhattan Bank (New York, New York) for the fifteenth (15th) day of the month for which the interest is charged.  Any judgment against an employer for contributions or withdrawal liability owed to this Fund shall include the greater of (a) a doubling of the interest computed and charged in accordance with this section or (b) single interest computed and charged in accordance with this section plus liquidated

damages in the amount of 20% of the unpaid contributions or withdrawal liability. The interest rate after entry of a judgment against an Employer for contributions or withdrawal liability shall be due from the date the judgment is entered until the date of payment, shall be computed and charged to the Employer on the entire judgment balance at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by Chase Manhattan Bank (New York, New York) for the fifteenth (15th) day of the month for which the interest is charged and shall be compounded annually.

(R 8; Art. XIV, Sec. 4 of PX 4).

xlix.   Kabbes owes delinquent contributions to the Pension Fund totaling $27,297, plus interest in the amount of an annualized interest rate equal to two percent (2%) plus the prime interest rate established by Chase Manhattan Bank (New York, New York) for the fifteenth day of the month for which the interest is charged.

l.      Effingham owes delinquent contributions to the Pension Fund totaling $12,936, plus interest in the amount of an annualized interest rate equal to two percent (2%) plus the prime interest rate established by Chase Manhattan Bank (New York, New York) for the fifteenth day of the month for which the interest is charged.

li.     The interest owed by the Defendants totaled $10,548.86 through February 15, 2001. The Pension Fund shall submit a schedule detailing interest through the date of judgment within 7 days of the entry of the Court's Findings of Fact and Conclusions of Law.

lii.    Kabbes owes to the Pension Fund liquidated damages under Section 502(g)(2) of ERISA, 29 U.S.C. §1132(g)(2) in the amount of doubling of the interest or single interest plus 20% of the unpaid contributions, whichever is greater.

liii.   Effingham owes to the Pension Fund liquidated damages under Section 502(g)(2) of ERISA, 29 U.S.C. §1132(g)(2) in the amount of doubling of the interest or single interest plus 20% of the unpaid contributions, whichever is greater.

liv.    Kabbes and Effingham are liable to the Pension Fund attorneys fees and costs associated

with prosecuting this action.  Attorneys' fees and costs will be handled in accordance with

Local Rule 54.

lv.     Kabbes and Effingham are liable to the Pension Fund the audit fees and costs of $3,524

associated with conducting the audit.

### III. CONCLUSION

For the foregoing reasons, judgment is entered for Plaintiffs in the amount of $54,305.86.

IT IS SO ORDERED.

ENTER:

Charles Ronald Norgle, Judge
United States District Court

DATE:    *11-17-04*